IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JASON C. CORY,

        Plaintiff,

v.                                        Case No. 12-2547-JTM

THE CITY OF BASEHOR, et al.,

        Defendants.

MEMORANDUM AND ORDER

Plaintiff Jason C. Cory filed his complaint in Leavenworth County District Court on July 5, 2012, alleging a variety of claims related to the termination of his employment as a police officer for the City of Basehor. The defendants removed the case to federal court on August 21, 2012. On January 29, 2014, the defendants filed their Motion for Summary Judgment, seeking judgment in their favor on all of Cory's claims.

In his response, Cory failed to refute the facts asserted by the defendants in their Motion.[1] The court deems these facts admitted, as they are not genuinely disputed.[2] The facts asserted by the defendants are all based on Cory's deposition transcript, Chief Martley's affidavit, and documents attached to their memorandum in support of the motion. The court lists the material facts below.

---

[1] *See* D. Kan. Rule 56.1(b)(1). The rule states that "[a] memorandum in opposition to a motion for summary judgment must begin with a section containing a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute must be numbered by paragraph, refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed." *Id.* Cory's response brief includes a statement of facts but does not controvert any of the defendants' facts.

[2] *See* D. Kan. Rule 56.1(a) The rule states: "All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."

**I. Uncontroverted Facts**

Jason C. Cory is a resident of the City of Basehor in Leavenworth County. The City of Basehor is a Kansas municipality. Defendant Lloyd Martley is the Chief of Police for the City of Basehor. Defendant Robert Pierce is the Police Lieutenant for the City of Basehor.

In September of 2007, Cory secured employment as a police officer with the City of Basehor. Cory was unaware of any employment contract with the City and understood that he could quit his job as a police officer at any time. Chief Martley told Cory on several occasions that he could terminate Cory's employment for any reason. After beginning his employment with the City on September 9, 2007, Cory received a copy of the City's personnel documents, including the City of Basehor Employee Policy Handbook and Personnel Policies and Guidelines. The handbook states that "both the employee and the CITY OF BASEHOR have the right to terminate employment at will, with or without cause or advance notice." Dkt. 38, Exh. J, p. 17. The Personnel Policies and Guidelines states that "[t]hese policies and guidelines do not create contractual employment rights." Dkt. 34, Exh. 6, p. 1.

During his employment with the Basehor Police Department, Cory reported to his superiors what he perceived to be violations of the department's policies. He believed these violations reflected problems with safety and integrity in the department. Cory reported these issues as part of his standard operating procedure, and he considered the reports part of doing his job as a police officer.

2

Cory reported that other officers had unloaded shotguns located in patrol vehicles for emergency use. He reported that officers had placed shotguns into the trunks of police units rather than keeping them inside the passenger compartment where they would be accessible by the officer in an emergency. Cory reported functional problems with the cameras on patrol vehicles. He reported that the holsters provided by the department were incorrect for the officers' issued sidearms.

Cory reported that the tires on his patrol vehicle were bald. He emailed Martley and Pierce that his tires were in need of attention. Martley inspected the tires and determined the department could get more miles out of them. Citing budgetary concerns, Martley suggested that the tires be rotated. When Cory went to the shop, the maintenance worker said they could not be rotated. Martley then told Cory to replace his tires with four tires from the garage. After this, Cory did not report any further problems with the tires on his vehicle.

Cory also complained that officers went home or to the office and slept on the job instead of remaining on patrol, making them unavailable to provide backup. After receiving complaints from Cory and other officers, Chief Martley sent a department-wide memorandum addressing the issue.

Cory alleges that he found himself in the middle of a management conflict after Chief Martley told him not to pursue a criminal investigation for identify theft. In Martley's opinion, the facts reported by Cory did not constitute a crime. Cory reported this to Pierce, who told him to pursue the investigation behind Martley's back.

Cory overheard a private conversation between Martley and Pierce about whether and how officers should respond to an emergency call involving a child's asthma attack. Cory did not believe they knew anybody could hear their conversation. Cory complained to Martley that he believed the conversation had been inappropriate and that it was a conversation two supervisors should not be having.

On June 30, 2010, Pierce called Cory into Chief Martley's office. The two defendants wanted to talk to Cory about a report that he had improperly used city resources. Cory denied any improper use of city resources. Pierce thought Cory was being dishonest because his statements conflicted with what another city worker had said. Pierce raised his voice, and he and Cory reached to shut the door. Pierce's hand knocked Cory's hand out of the way. Cory backed up to the wall. Pierce brought his finger up close to Cory's face and thumped him on the chest twice. Cory was not hurt or offended by the action. Cory complained that Pierce's act constituted an assault on a law enforcement officer in the course of his duties under Kansas law.[3]

On July 1, 2010, Pierce prepared and signed a letter of reprimand addressed to Cory. The letter states that Cory violated a section of the Code of Conduct regarding courteous and respectful behavior toward superior ranked personnel. In the letter, Pierce warned that future violations of this or any other policy would result in progressive discipline against Cory.

---

[3]After his suspension, Cory filed a report with the Leavenworth County Sheriff's Department, alleging a violent physical assault by Pierce. The Sheriff's Department did not pursue the claim.

4

On July 9, 2010, Martley met with Cory to discuss the incident. When the conversation ended, Martley noticed that Cory had been wearing a device to record their conversation. Cory wore the tape recorder in his shirt pocket and did not tell Martley or seek his permission to record the conversation. After realizing Cory had been recording the conversation, Marley suspended Cory indefinitely.

On July 15, 2010, the City of Basehor terminated Cory's employment. Martley felt he could no longer trust Cory as a member of the police force. He had never caught any other officer recording or attempting to record their private conversations. Martley believed that the loss of trust between the two would disrupt the efficient operation of the police department. Martley also terminated Cory for his inability to get along with co-workers.

## II. Legal Standard for Summary Judgment

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact." *Id.* Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its

entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Nat. Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove [nonmovant's] claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987) (alterations added).

## III. Analysis

In his complaint, Cory made four claims: wrongful termination of employment, breach of employment contract, violation of civil rights under 42 U.S.C. § 1983 and intentional infliction of emotional distress. Cory asserted each claim against all defendants. The court analyzes each claim separately, starting with the breach of contract claim because other claims hinge on result of that analysis.

### A. Breach of Employment Contract

Cory claims that the defendants breached his contract when they terminated his employment without following the proper procedures. Specifically, Cory alleges he was entitled to a written notice of misconduct, a meeting with the appropriate authority, an opportunity to refute the factual allegations against him, a final written decision and written notification of the facts to file a grievance. Cory argues he could only be terminated for "serious misconduct" according to his contract of employment and that he was terminated without any reasonable justification.

The defendants argue that no employment contract, explicit or implicit, ever existed between Cory and the City of Basehor. They argue that the documents Cory relies upon as establishing his contractual rights—the City's Employee Policy

Handbook and Employee Discipline Policy—are insufficient to establish a contract. The defendants assert that Cory is an at-will employee and, as such, his termination requires no justification under Kansas law.

Kansas historically adheres to the employment-at-will doctrine, which holds that employees and employers may terminate an employment relationship at any time, for any reason, unless there is an express or implied contract governing the employment's duration. *Campbell v. Husky Hogs, LLC*, 292 Kan. 225, 227, 255 P.3d 1 (2011) (citing *Morriss v. Coleman Co.*, 241 Kan. 501, 510, 738 P.2d 841 (1987)). In this case, Cory admitted in his deposition and in his response to this motion that he was never given an explicit employment contract. The court need only analyze whether an implied contract existed between the parties.

"An implied employment contract arises from facts and circumstances showing a mutual intent to contract." *Inscho v. Exide Corp.*, 29 Kan. App. 2d 892, 895–96 (2001). "Relevant factors to consider in deciding whether the parties had mutual intent to contract include: (1) written or oral negotiations; (2) the conduct of the parties from the commencement of the employment relationship; (3) the usages of the business; (4) the situation and objective of the parties giving rise to the relationship; (5) the nature of the employment; and (6) any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time employment commenced." *Id.*

Cory admits he did not negotiate for the procedures included in the personnel documents at issue. He also admits to being aware that he could quit at any time and

that the department could terminate him for any reason. However, he maintains that the personnel documents establish an implied contract entitling him to certain protections.

"The Kansas Supreme Court has recognized the existence of an employment manual as one indicium of an implied contract, but a 'written personnel policy alone is not sufficient to establish an implied contract of employment.' " *Brantley v. Unified Sch. Dist. No. 500*, 405 Fed. App'x 327, 334 (10th Cir. 2010) (quoting *Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 138, 815 P.2d 72 (1991)). "Rather, as a matter of law, plaintiffs must provide additional corroborating evidence before a court may conclude that a jury could find an implied contract." *Id.*

In *Brantley v. Unified School District Number 500*, 405 Fed. App'x 327 (10th Cir. 2010), the plaintiff challenged his demotion as a violation of due process. His employer, the school district, had in place an employee grievance process for employees to lodge complaints alleging violations, misapplications, or misinterpretations of regulations. *Brantley*, 405 Fed. App'x at 329–30. Additionally, the school district had adopted a set of written policies entitled "Administrative Guidelines," which defined the term "just cause" and provided a non-exclusive list of situations or acts included in the term. *Id.*

The U.S. Court of Appeals for the Tenth Circuit considered whether an implied employment contract existed. *Id.* at 334–35. The Tenth Circuit found the employment manual was insufficient to establish an implied contract, pointing out that although it defined "just cause," the manual did not require just cause for the school district to terminate, transfer or demote its employees. The court held that additional testimony by

school administrators reiterating the provisions in the manual was insufficient additional evidence to support an implied contract.

This case is similar to *Brantley*. The Employee Policy Handbook that Cory relies on establishes a grievance process and a procedure for disciplinary action. It also presents a non-exclusive list of various types of misconduct that could subject an employee to termination. Importantly, the handbook does not provide that the employer may only terminate employees for misconduct. *See Brantley*, 405 Fed. App'x at 335; *contra Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841 (1987) (holding the manual created an implied contract when it stated that no employee would be dismissed except for "good cause.").

Further, the employment manual at issue here establishes that both parties "have the right to terminate employment at will, with or without cause or advance notice . . . ." Dkt. 38, Exh. J, p. 17. In *Morriss*, the court pointed out that the at-will disclaimer in the handbook was insufficient because the employer did not show that it brought the disclaimer to the employee's attention. 241 Kan. at 514. In this case, Cory testified that he was frequently reminded by Chief Martley of his at-will status. Dkt. 34, Exh. 2, p. 424–25 (quoting Martley as saying "I can fire you for the color of your hair, for any reason if I want to."). Cory also testified that he was constantly fearful for his job. *Id.* at 425. Although Cory argues in his response that his statement regarding fear is evidence of emotional distress, it also shows awareness of his at-will status—a status that can be emotionally distressful for an employee. Additionally, in 2008, while Cory was still employed with the police department, the City of Basehor published Charter

Ordinance No. 20, which states: "A requirement of good cause before terminating an employee is inconsistent with the Employee At-Will Doctrine in the State of Kansas and the personnel policies and procedures adopted by the City on December 3, 2007." All of these facts foreclose the possibility that Cory was unaware of his at-will status.

Cory's termination may, at first blush, appear troubling when compared with the procedures set forth in the employee handbook, which the department did not follow here. However, having a policy in place does not *ipso facto* create a binding contractual duty on the employer. "There is a distinct difference between a policy which a given employer might adopt and sincerely intend to follow, and normally does follow, and a binding contractual duty." *Berry v. Gen. Motors Corp.*, 838 F. Supp. 1479, 1492 (D. Kan. 1993) *aff'd*, 56 F.3d 1233 (10th Cir. 1995). "An employer may adopt a policy to bring clarity, or predictability, or even a sense of fairness to the employment relationship without intending to be contractually bound by it." *Id.*

The handbook at issue here clearly maintains the at-will doctrine, and Cory's testimony establishes his awareness of it, distinguishing the case from *Morriss*. Without any additional evidence, the facts do not establish an implied contract. *See Brantley*, 405 Fed. App'x at 335. Cory's argument that the court should consider the parties bound by a contract of adhesion misses the mark. To argue that a contract of adhesion exists assumes *a priori* the existence of a contract. That assumption is improper here, so the argument fails.

No reasonable jury could find that a contract existed between Cory and the City of Basehor. Accordingly, the court grants summary judgment to the defendants on Cory's breach of contract claim.

### B. Wrongful Termination

Cory claims he was wrongfully terminated in retaliation for reporting misconduct and policy violations by the Basehor City Police Department officials and employees. Cory claims his termination constitutes retaliation against a whistleblower.

"Kansas follows the common-law employment-at-will doctrine, which allows employers to terminate employees for good cause, for no cause, or even for the wrong cause." *Goodman v. Wesley Med. Ctr.*, 276 Kan. 586, 589, 78 P.3d 817 (2003). "To prevail on a retaliatory discharge claim, an employee must demonstrate that he or she falls within one of the exceptions to the employment-at-will doctrine." *Bracken v. Dixon Indus., Inc.*, 272 Kan. 1272, 1275, 38 P.3d 679 (2002). "One of those exceptions is termination for whistleblowing." *Palmer v. Brown,* 242 Kan. 893, 900, 752 P.2d 685 (1988).

"To establish a retaliatory discharge claim for whistleblowing, a plaintiff has the burden of proving the following elements by clear and convincing evidence:

> '[A] reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report.' "

*Goodman*, 276 Kan. at 589–90 (quoting *Palmer*, 242 Kan. at 900).

The court applies a burden-shifting analysis to whistleblowing retaliatory discharge claims. *Shaw v. Sw. Kansas Groundwater Mgmt. Dist. Three*, 42 Kan. App. 2d 994, 219 P.3d 857 (2009). If the employee can first establish a prima facie case, "the employer then bears the burden of producing evidence that the employee was terminated for a legitimate nondiscriminatory reason." *Goodman*, 276 Kan. at 590. "If that takes place, the burden then shifts back to the employee to produce evidence that the employer's motives were pretextual." *Id.* "To avoid summary judgment, the employee must assert specific facts disputing the employer's motive for termination." *Id.* (citing *Bracken,* 272 Kan. at 1276).

The defendants do not dispute that Cory has made a prima facie showing of the second required element that the police department—and by extension the City and individual defendants—had knowledge of his reporting these complaints before terminating his employment. Considering the second element met, the court considers only the first and third elements of Cory's prima facie retaliation case.

The court begins its analysis with the first element. Cory must show that a reasonably prudent person would have concluded that either his co-workers or the City of Basehor Police Department itself was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare. *Goodman*, 276 Kan. at 589 (quoting *Palmer*, 242 Kan. at 900). The violation must be serious. *See Palmer*, 242 Kan. at 689–90. "[T]he public policy must be 'so definite and fixed that its existence is not subject to any substantial doubt.' " *Goodman*, 276 Kan. at 593 (quoting *Palmer,* 242 Kan. at 897).

Cory relies in part on the police department's internal policies for the rules he believes were violated. In support of his concern that other officers were unloading shotguns and placing them in vehicle trunks, he cites Section 1.4 of the Code of Conduct: "Officers shall not unlawfully commit acts or behave in such a manner that has the potential for endangering or injuring themselves, property or another person," and shall not "[f]ail . . . to report damaged or dysfunctional equipment that has the probability of endangering persons or property." Cory also relies on this policy for his reports that the officers were equipped with incorrect holsters and that cameras on patrol units were not operating properly. Cory points out the "Use and Care of Property and Equipment" provision of the same section: "Officers are accountable for the proper use and care of any property or equipment assigned to them, used by them, or placed under their direct or constructive care."

The defendants cite *Herman v. Western Financial Corp.*, 254 Kan. 870, 869 P.2d 696 (1994) to argue that an employer's internal policies and procedures can never be considered rules, regulations or laws pertaining to public health, safety and general welfare. Cory provides no case law that would suggest otherwise. However, the defendants misconstrue the holding in *Herman*.

In *Herman*, the plaintiff alleged that she was terminated because she reported violations of her employer's internal policies and guidelines regarding loan qualifications. 254 Kan at 880–82. The plaintiff argued that these loan policies and guidelines were rules pertaining to the general welfare because the public incurs the costs when savings and loan associations collapse due to making bad loans. *Id.* at 882.

13

The Kansas Supreme Court held the granting of a loan that failed to meet the employer's internal policies "did not violate 'rules, regulations, or the law pertaining to public health, safety, and the general welfare.' " *Id.* Contrary to the defendants' argument, the Court did not hold that internal policies could *never* qualify as "rules" in a whistleblower claim. It simply held that the internal policies at issue in *Herman* did not qualify as such.

This court declines to establish the rule defendants suggest -- that no internal policy could ever qualify as a rule pertaining to public health, safety or general welfare. However, the policies Cory relies upon are too vague to qualify Cory for whistleblower protection in this case because they do not specifically refer to the loading and location of shotguns in patrol units, proper holsters or cameras in patrol units. *See Goodman*, 276 Kan. at 593 (holding that when the policy cited "does not provide definite or specific rules, regulations, or laws, it cannot be the basis for a retaliatory discharge claim."). Rather than breaching specific rules, these alleged policy violations are merely Cory's opinion of how the department should run. Courts in Kansas have not endowed "every workplace dispute over the water cooler on company practices . . . with whistle-blower overtones." *Fowler v. Cirticare Home Health Servs., Inc.*, 27 Kan. App. 2d 869, 878, 10 P.3d 8 (2000).

Cory also voiced his concern that the department's vehicles had bald tires. Cory argues the department was violating Section 393.75 of the U.S. Department of Transportation, Motor Carrier Safety Administration and Kan. Stat. Ann. § 8-1742. Section 393.75 is inapplicable because that rule establishes minimum standards for

commercial motor vehicles as defined in § 390.5, and this definition does not include the patrol vehicles at issue here. *See* 49 C.F.R. § 393.1.

The Kansas law cited by Cory is also unhelpful to his case. The statute establishes that "[e]very solid rubber tire on a vehicle shall have rubber on its entire traction surface at least one inch thick above the edge of the flange of the entire periphery." KAN. STAT. ANN. § 8-1742. However, a violation of the statute is merely a traffic infraction, which is neither a misdemeanor nor a felony. *See State v. Kelley*, 38 Kan. App. 2d 224, 226–27, 162 P.3d 832, 834 (2007); KAN. STAT. ANN. § 8-1701 (stating that, with exceptions not applicable here, any violation "of any provision of article 17 is a traffic infraction."). This is not the type of serious violation that has endowed a reporting employee with whistleblower protection in Kansas courts. *See, e.g.*, *Palmer*, 242 Kan. at 899 (granting whistleblower status to an employee reporting Medicaid fraud—a felony under state and federal law).

More importantly, Cory provides no facts indicating that his suspension and termination were related in any way to his reporting of these conditions. Cory testified at his deposition that Chief Martley responded to Cory's concern about the tires by inspecting them and determining the department could get "a couple thousand more miles" out of them, citing budget concerns. Dkt. 34, Exh. 1, pg. 157–58. Martley also directed that the tires be rotated. *Id.* at 158. After a mechanic determined they could not be rotated, Martley told Cory he could replace the tires. Cory does not allege that he continued to express concerns or report violations of the traffic code by the department. Rather than firing Cory for his complaints of bald tires, Martley saw the problem fixed.

No reasonable jury could find that Cory has established a prima facie showing of retaliation based on the condition of the police department's tires. The court grants summary judgment to the defendants on this basis of the wrongful termination claim.

Cory complained about a distasteful conversation he overheard between Chief Martley and Pierce regarding how much money it costs the department to respond to emergency situations like child asthma attacks. Cory stated in his deposition that he complained to Martley that the conversation was inappropriate. Martley acknowledged that the conversation had occurred but apparently ignored the complaint. Cory points to no rule, regulation or law violated by the defendants' conversation. Cory does not allege that either defendant ordered subordinates to not respond to any emergency situations. Cory's opinion as to the propriety of a conversation by his supervisors is not a proper legal basis for his wrongful termination claim, and the defendants are entitled to judgment as a matter of law on this claim. The court grants summary judgment to the defendants on Cory's wrongful termination claim to the extent it relies upon this conversation.

Cory complained about receiving conflicting orders from his superiors when he wanted to investigate what he believed was an identity theft case. Chief Martley determined that the set of facts did not amount to a crime and directed Cory not to pursue the case. Cory then discussed it with Pierce, who told him to "just go and do what you know is right to do and go behind [his back]—I go behind his back all the time." The Kansas Supreme Court has held "that the actions of the troopers in openly denouncing and protesting within their chain of command to other 'law enforcement

officials' illegal activity in not enforcing laws designed for public safety may be protected internal whistleblowing." *Connelly v. State Highway Patrol*, 271 Kan. 944, 974, 26 P.3d 1246 (2003). But even if report were sufficient for Cory to be considered a whistleblower, Cory must show that he was discharged in retaliation for making the report. *Goodman*, 276 Kan. at 590 (quoting *Palmer*, 242 Kan. at 900). Cory does not allege any facts and has not provided any evidence showing that anyone at the department took any adverse employment action against him as a result of these events. The complaint is insufficient to support a prima facie wrongful termination claim on this basis, and the defendants are entitled to summary judgment.

Cory alleges that other officers were unavailable for backup calls because they would go home or back to the office and sleep on duty. The Personnel Policies and Guidelines specifically list "sleeping on the job" as misconduct subject to disciplinary action. Dkt. 38, Exh. J, p. 12–13. Further, Section 1.4 of the General Orders "Code of Conduct" states that "Officers shall, during the line of duty, come to the aid of another member when a request or need is made known." Dkt. 38, Exh. N, p. 1. Although these are internal rules, the court recognizes that the result of a breach of these rules could result in grave consequences for public safety. But even if this reporting entitles Cory to protection as a whistleblower, he once again fails to make a prima facie showing that he was subject to an adverse employment action as a result of these reports.  Instead, Cory stated at his deposition that after he and other officers made Chief Martley aware of the problem, Martley sent a department-wide memorandum addressing it. Cory provides no evidence that would enable a reasonable jury to conclude that Martley or any other

co-worker retaliated against him for this complaint. Accordingly, the defendants are entitled to summary judgment to the extent that Cory's wrongful termination claim relies on this basis.

Cory claims Chief Martley retaliated against him after Cory tried to report a physical assault by Pierce. The incident at issue occurred on June 30, 2010, when all three parties met in Martley's office to discuss a report that Cory had improperly ordered and used dirt and a culvert from the city. After Cory gave his explanation, Pierce indicated that he did not believe Cory's version of what happened. As the situation escalated, Cory and Pierce both reached to shut the office door. According to Cory, Pierce bumped his hand away from the door and told him to "get out of the way" before shutting the door. Dkt. 34, Exh. 2, p. 319. Cory backed up against a wall as Pierce approached him. Cory testified that Pierce brought his finger up and "bumped my chest" twice, as he stood "an inch, maybe half an inch away from my face." *Id*. at 320–21.

Cory argues that this constituted an illegal assault under Kan. Stat. Ann. § 21-3409. The Kansas law Cory cites was repealed, but it was in force at the time the incident occurred, and it prohibited assaulting a law enforcement officer. KAN. STAT. ANN. § 21-3409 (2004) (repealed July 1, 2011). The statute relied on Kan. Stat. Ann. § 21-3408 for its definition of assault: "Assault is intentionally placing another person in reasonable apprehension of immediate bodily harm." *See id*.

Although this statute could theoretically suffice for establishing whistleblower protection, Cory must show that a reasonably prudent person would have concluded

that his co-worker or employer was violating this rule. *See Goodman*, 276 Kan. at 589–90 (quoting *Palmer*, 242 Kan. at 900). Cory testified that he was neither hurt nor offended by Pierce's physical contact. Dkt. 34, Exh. 2, p. 326. He also made very clear that any apprehension he felt was because he feared he might lose his job. *Id.* at 323. The court doubts that a superior officer poking a subordinate officer's chest twice with his finger would qualify as assaulting a law enforcement officer in the course of his or her duties. The court is certain that the assault statute covers only apprehension of immediate bodily harm and not, as Cory claims, apprehension of losing one's job. No reasonably prudent person could conclude that Pierce's conduct amounted to an assault on a law enforcement officer. Accordingly, Cory fails to establish a prima facie showing of wrongful termination on these facts as well. The court grants the defendants' summary judgment on this claim.

In addition, even if Cory could establish a prima facie case against the defendants for wrongful termination, the defendants have established a legitimate nondiscriminatory reason for suspending and terminating Cory's employment. Chief Martley states in his affidavit that he suspended and terminated Cory because of his inability to get along with coworkers and because he lost the trust of his command staff. Dkt. 34, Exh.  4, p. 2. Specifically, Martley points out that when he met with Cory about the incident with Pierce, he noticed a "tape recorder in Cory's pocket, which was revealed only after he bent over to retrieve something from the car." *Id.* at 1. Martley "believed Cory was surreptitiously recording [their] private conversation." *Id.* Martley testified that this act, done without his knowledge or consent, resulted in a loss of trust

in Cory. The loss of trust in an officer is a legitimate, nondiscriminatory reason for termination in a police department, where supervising officers must have full confidence in the honesty and integrity of their subordinate officers. To be clear, the court is not commenting on the honesty and integrity of Cory but on Chief Marley's impression of these characteristics, which is the key.

As a means of additional support for failing to "get along with others," the defendants attach a letter of reprimand addressed to Cory, signed by Pierce and dated July 1, 2010. *See* Dkt. 34, Exh. 3. The letter describes the incident that took place on June 30, 2010. It states that it "is intended to serve as an official written reprimand for [Cory's] violation of the Basehor Police Department, General Order 1.4: Code of Conduct: **COURTEOUS AND RESPECTFUL BEHAVIOR TOWARD SUPERIOR RANKED PERSONNEL**." *Id.* (emphasis in original). The letter states that "[f]uture violations of this or other policy will result in the application of progressive discipline." *Id.* The conversation when Martley noticed Cory's tape-recording device occurred on July 9, 2010, one week after this letter was written. This order of events establishes the defendants' legitimate nondiscriminatory reason for terminating Cory's employment. Cory provides no evidence to rebut this reason.

After reviewing each report upon which Cory relies for his wrongful termination claim, the court concludes that he has not made a prima facie showing of all elements of his claim. The court further concludes that the defendants have established a legitimate and nondiscriminatory reason for terminating Cory and that Cory provides no evidence

rebutting this reason. As a result, the court grants the defendants' summary judgment on Cory's wrongful termination claim.

*C. § 1983 Claims*

Cory alleges that the defendants violated his constitutional and statutory rights. Specifically, Cory claims violations of his First Amendment right to free speech as applied to the State and City under the Fourteenth Amendment, Fifth Amendment rights to due process and equal protection as applied to the State and City under the Fourteenth Amendment and rights to criminal redress under the Kansas Crime Victim's Compensation Act.

1. First Amendment

Cory's claim that the defendants violated his First Amendment right to free speech echoes his wrongful termination claim. He claims that he was terminated for speaking out about breaches of safety policies and other practices within the department.

"[A] state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983) (internal citations omitted). However, a public employee's right to free speech is not absolute. The court's task, "is to seek 'a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Id.* (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

21

The court must first determine "whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Pickering*, 391 U.S. at 568). "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146. "Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." *Id.* (internal citations omitted). If the court determines the employee spoke as a citizen on a matter of public concern, "the question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418.

The U.S. Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) is helpful in the court's analysis. In *Garcetti*, Richard Ceballos—a deputy district attorney for the Los Angeles County District Attorney's Office—believed the affidavit used to obtain a search warrant contained serious misrepresentations. 547 U.S. at 414. He wrote a memorandum to his supervisor communicating this opinion and recommending dismissal of the case. *Id.* Ceballos's department held a meeting to discuss the affidavit. *Id.* The meeting was contentious, with a lieutenant of the sheriff's department criticizing Ceballos's handling of the case. *Id.* Ultimately, the department decided to proceed with

22

the prosecution despite Ceballos's objections. *Id.* Ceballos suffered a number of adverse employment actions in the aftermath. *Id.* at 415. He alleged that his employer violated the First and Fourteen Amendments by retaliating against him based on his memo. *Id.*

The Court began its analysis with whether Ceballos was speaking as a citizen on a matter of public concern. The Court pointed out that Ceballos's expressing "his views inside his office, rather than publicly, [was] not dispositive." *Id*. at 420. The Court noted that "[e]mployees in some cases may receive First Amendment protection for expressions made at work." *Id.* The Court also stated that although the memo concerned the subject matter of Ceballos's employment, this was also not dispositive. "The First Amendment protects some expressions related to the speaker's job." *Id.*

The Court held that the controlling factor was that Ceballos's "expressions were made pursuant to his duties as a calendar deputy." *Id.* at 421. That "Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case" distinguished the case "from those in which the First Amendment provides protection against discipline." *Id.* Ceballos had no First Amendment protection when he "wrote his disposition memo because that is part of what he . . . was employed to do." *Id.* In writing his memo, Ceballos did not speak as a citizen; he spoke as a government employee. *Id.* at 422.

As in *Garcetti*, Cory expressed himself within the confines of his office rather than publicly, and he spoke concerning the subject matter of his employment. These are not dispositive factors. *Id.* at 420. However, Cory's expressions were like those of Ceballos because they were made pursuant to his duties as part of his employment.

23

Cory justified his speech by arguing that the police department's internal policies required him to report his concerns up the chain of command.

Further, Cory does not acknowledge, let alone address, the *Garcetti* case in his response. He relies solely on dicta discussing the importance of First Amendment free speech rights in a broad sense, all from cases that are all at least thirty years old in an developing area of law. *See, e.g.*, *Roth v. United States*, 354 U.S. 476, 484 (1957) (stating that "[s]peech concerning public affairs is more than self-expression; it is the essence of self-government"). As a result, it is undisputed that Cory was not speaking as a citizen but as a City of Basehor employee, and his speech was not entitled to First Amendment protection.

### 2. Due Process

Cory also claims that his termination violated his right to due process under the Fifth and Fourteenth Amendments. "The Due Process clause of the Fourteenth Amendment does not prohibit the government from depriving an individual of 'life, liberty, or property'; it protects against governmental deprivations of life, liberty, or property 'without due process of law.' *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994) (citing U.S. CONST. amend. XIV). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). "In determining whether an individual has been deprived of his right to procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were

applicable; and if so, then (2) was the individual afforded an appropriate level of process." *Farthing*, 39 F.3d at 1135 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)).

"[P]roperty interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " *Id.* (quoting *Roth*, 408 U.S. at 577). "In the context of a public employee . . . the touchstone is whether, under state law, the employee has a legitimate claim of entitlement in continued employment, as opposed to a unilateral expectation or an abstract need or desire for it." *Id.* (internal quotation marks and citation omitted). No property interest in a job exists unless it is created by statute, ordinance, or implied or written contracts. *Stoldt v. City of Toronto*, 234 Kan. 957, 964, 678 P.2d 153 (1984). The court must first determine whether Cory had a property interest in his continued employment under Kansas law.

The court has already held that Cory had no contract—express or implied—with the City of Basehor. Therefore, the only remaining sources that could establish a property interest are statutes and ordinances. "Kansas law clearly establishes the incumbent to a public office enjoys no *property* or *vested interest* in public office." *Id.* (emphasis in original). Cory relies on his whistleblower status—which the court has already denied—and Kan. Stat. Ann. § 75-2597(d)(1), a statute that literally does not exist. Through its own research, the court believes that Cory likely intended to rely on Kan. Stat. Ann. § 75-2973, the Kansas Whistleblower Act, but this does not establish a due process right because—as the court held above—Cory is not a whistleblower.

Without a statute, ordinance or contract to create a property interest in continued public employment, Cory was not due any process in his termination and the defendants are entitled to judgment as a matter of law. Accordingly, the court grants summary judgment to the defendants on Cory's due process claim.

### 3. Equal Protection

Cory voluntarily withdraws his claim for violation of equal protection, citing *Sims v. United Gov't of Wyandotte Cnty.*, 120 F. Supp. 2d 938 (D. Kan. 2000) as adverse authority. District court opinions have persuasive value only and are not binding as a matter of law. However, the defendants do not object to the withdrawal of the claim. The court, therefore, grants summary judgment to the defendants on Cory's equal protection claim.

### 4. Kansas Victim's Compensation Act

In the complaint, Cory alleges that the defendants violated his "rights of criminal redress, including all rights allowed him under the Kansas Crime Victim's Compensation Act, K.S.A. 74-7301 *et seq.*" The defendants argue that Cory fails to state a claim because he does not identify which rights have been violated, how they have been violated, or the specific redress Cory has been unable to obtain. Further, the defendants argue that the appropriate party for this type of claim would be the Kansas Crime Victim Compensation Board.

Cory does not directly address these arguments in his response. The only statement in his response related to this claim is that "his right of criminal redress under the Kansas Crime Victim's Compensation Act falls under the broader category of right

26

to redress grievances set forth under the First Amendment . . . ." The court is unclear on what effect this statement has on the basis of the claim.

To the extent that Cory's claim rests on a right to redress grievances under the First Amendment, the court refers to its First Amendment analysis above and grants judgment to the defendants. To the extent that Cory's claim rests on the Kansas Crime Victim's Compensation Act, he fails to state a claim for the reasons argued by the defendants, and the court dismisses it under Federal Rule of Civil Procedure 12(b)(6).

### D. Intentional Infliction of Emotional Distress

Cory's claim for intentional infliction of emotional distress rests on several actions: (1) Martley saying that the Department didn't like how Cory was hired; (2) belittling of Cory's actions by his superiors; (3) one officer not speaking with Cory for eight months; (4) Cory's supervisor backing out on him during a call; (5) command staff giving Cory conflicting orders; (6) Martley terminating Cory's employment; (7) Cory constantly fearing the loss of his job; (8) officers unloading the shotgun in the patrol unit Cory used; (9) an officer telling Cory he would "kick his ass"; and (10) Pierce's "thumping" Cory on the chest two times.

In Kansas, the tort of intentional infliction of emotional distress is the same as the tort of outrage. *Hallam v. Mercy Health Ctr. of Manhattan, Inc.*, 278 Kan. 339, 340, 97 P.3d 492 (2004). A party may be held liable when he is determined to have engaged in extreme and outrageous conduct and thereby has intentionally or recklessly caused severe emotional distress to the plaintiff. *Moore v. State Bank of Burden*, 240 Kan. 382, 388, 729 P.2d 1205 (1986), *cert. denied*, 482 U.S. 906 (1987). To prevail in his claim, a plaintiff

must establish that (1) the conduct of the defendant was intentional, (2) it was extreme and outrageous, (3) there is a causal connection between the defendant's actions and plaintiff's mental distress, and (4) plaintiff's mental distress is extreme and severe. *Id.*

"Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." *Valadez v. Emmis Commc'ns*, 290 Kan. 472, 477, 229 P.3d 389 (2010) (citing *Roberts v. Saylor,* 230 Kan. 289, 292–93, 637 P.2d 1175 (1981)). "Conduct that rises to the level of tortious outrage must transcend a certain amount of criticism, rough language, and occasional acts and words that are inconsiderate and unkind." *Id.* "The law will not intervene where someone's feelings merely are hurt." *Id.* "In order to provide a sufficient basis for an action to recover for emotional distress, conduct must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Id.* (citing *Taiwo v. Vu,* 249 Kan. 585, 592–93, 822 P.2d 1024 (1991)).

Cory's allegations cannot establish a claim for intentional infliction of emotional distress for numerous reasons. The incidents cited by Cory fall into the categories of "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," to which liability for the tort of outrage does not extend. *See Wiehe v. Kukal*, 225 Kan. 478, 482, 592 P.2d 860 (1979) (internal citation omitted). "The rough edges of our society

28

are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Id.* (internal citation omitted).

Cory also fails to provide sufficient evidence that his emotional distress is severe. The complaint states that the defendants "cause[d] Plaintiff to suffer great emotional distress and suffering," but Cory has not provided any evidence of his emotional state. In his response, Cory argues that he testified in detail about suffering from extreme emotional distress and that he continues to be treated by several medical and psychological providers. However, Cory provides no evidence of these claims. He does not attach medical notes, prescriptions, or even the deposition sections that he cites in his response. Without any support, the statement is unsubstantiated and cannot defeat summary judgment. *See Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.").

No reasonable jury could find outrageous conduct by the defendants on these facts. No reasonable jury could find that Cory suffered severe emotional distress. The defendants are entitled to summary judgment on Cory's claim for intentional infliction of emotional distress.

### E. Qualified Immunity

The defendants argue that Martley and Pierce are entitled to summary judgment on the basis of qualified immunity. "The doctrine of qualified immunity protects

government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz,* 533 U.S. 194 (2001), the U.S. Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims. The court must first decide "whether the facts that a plaintiff has alleged (see FED. RULES CIV. PROC. 12(b)(6), (c)) or shown (see RULES 50, 56) make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232 (citing *Saucier*, 533 U.S. at 201). "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id*. "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The court has already analyzed Cory's constitutional claims, finding no violations. *See supra*, Sections III.C.1–3. Relying on this prior analysis, the court need not proceed to step two of the analysis of this issue. Pierce and Martley are entitled to qualified immunity on Cory's § 1983 claims.

## IV. Conclusion

The court finds no genuine dispute as to any material facts in this case, and the court holds that the defendants are entitled to judgment as a matter of law on all claims. Accordingly, the court grants summary judgment to the defendants.

IT IS THEREFORE ORDERED this 11th  day of July, 2014, that the defendants'

Motion for Summary Judgment (Dkt. 33) is granted.


s/J. Thomas Marten
J. THOMAS MARTEN, CHIEF JUDGE